This is an appeal from a judgment of the Athens County Common Pleas Court, Juvenile Division, awarding appellee Athens County Children Services ("ACCS") permanent custody of Timothy Bowers, born July 4, 1990.
Appellant, Emma Forgoress, the natural mother of the child, assigns the following errors:
FIRST ASSIGNMENT OF ERROR:
 "THE TRIAL COURT ERRED IN TERMINATING APPELLANT'S PARENTAL RIGHTS BECAUSE THE CHILDREN SERVICES AGENCY FAILED TO PROVE BY CLEAR AND CONVINCING EVIDENCE THAT APPELLANT'S CONDUCT HAS HAD A DIRECT ADVERSE IMPACT ON HER CHILD."
SECOND ASSIGNMENT OF ERROR:
 "THE TRIAL COURT ERRED IN TERMINATING APPELLANT'S PARENTAL RIGHTS BECAUSE THE CHIL[D]REN SERVICES AGENCY FAILED TO PROVE BY CLEAR AND CONVINCING EVIDENCE THAT THE CHILD COULD NOT BE PLACED WITH THE APPELLANT WITHIN A REASONABLE TIME OR SHOULD NOT BE PLACED WITH HER."
THIRD ASSIGNMENT OF ERROR:
 "THE TRIAL COURT ERRED IN TERMINATING APPELLANT'S PARENTAL RIGHTS BECAUSE THE CHILDREN SERVICES AGENCY FAILED TO PROVE BY CLEAR AND CONVINCING EVIDENCE THAT SUCH TERMINATION WAS IN THE BEST INTEREST OF THE CHILD."
FOURTH ASSIGNMENT OF ERROR:
 "THE TRIAL COURT ERRED IN ITS DECISION TERMINATING APPELLANT'S PARENTAL RIGHTS BECAUSE THE AGENCY FAILED TO MAKE REASONABLE EFFORTS TO PREVENT THE REMOVAL OF APPELLANT'S SON AND THE TRIAL COURT FAILED TO DESCRIBE THE RELEVANT SERVICES PROVIDED BY THE AGENCY AND WHY THEY WERE UNSUCCESSFUL."
Our review of the record reveals the following facts. Appellant, a twenty-eight year old woman, suffers from dissociative identity disorder, formerly known as multiple personality disorder. Appellant's symptoms include depression, agitation, severe anxiety, sleeping problems, lack of motivation and energy, suicidal thoughts, self-destructive behavior, and hearing voices. Appellant also experiences episodes of dissociation, a mechanism trauma victims frequently employ to distance or separate themselves from a past trauma. When appellant dissociates, she loses track of time and becomes unaware of her surroundings or where she may be.
Appellant's disorder ostensibly results from the severe abuse she suffered as a child. When appellant was two years old, her father began to assault her physically, emotionally, and sexually. Her father also provided her with drugs and alcohol. The abuse continued until appellant reached the age of sixteen, when she was placed in foster care and entered substance abuse programs.
After being removed from her home, appellant testified against her father at a criminal trial and her testimony helped to convict her father. Her claims against her father, however, caused much tension within her family. Appellant stated that most of her family members, including her mother, did not believe appellant's claim that her father abused her.
On July 4, 1990, appellant gave birth to Timothy. Appellant stated that her sister's then-boyfriend, Harvey Bunn, raped her and that Timothy was conceived during the rape.
In the mid-1990s, appellant and Steve Forgoress were married. Forgoress physically abused appellant and Timothy. During this time period, Timothy began experiencing behavioral problems. Appellant took Timothy to Tri-County Mental Health and Counseling, Inc. ("TCMHC") for an assessment and treatment. Timothy eventually was prescribed Mellaril, Zoloft, and Prozac.
In late 1995, ACCS became aware of the domestic troubles occurring within the Forgoress home. Between October 1995 and October 1996, Timothy was in and out of foster care, mostly under Voluntary Agreements for Care. During this time period, appellant, in early 1996, divorced Forgoress.
On October 21, 1996, ACCS filed a complaint alleging Timothy to be a neglected and dependent child and requested the trial court to grant ACCS emergency custody. On October 21, 1996, the court granted ACCS's motion.
On December 30, 1996, the trial court adjudicated Timothy a dependent child based upon his mother's continuing mental health problems and granted ACCS temporary custody.[1] The court further ordered: (1) ACCS to work to reunify appellant and her son; (2) appellant and Timothy to attend joint counseling; and (3) appellant and Timothy to attend individual counseling.
Throughout 1997 and into 1998, ACCS retained temporary custody of Timothy. On July 27, 1998, ACCS filed a motion to modify the disposition to permanent custody pursuant to R.C. 2151.353 (E)(2).[2]
ACCS asserted that although appellant expressed a desire to be reunified with her son, appellant's mental health problems interfere with Timothy's well-being. Specifically, ACCS alleged that: (1) appellant's "repeated needs for respite and hospitalization" caused her visitation with Timothy to be sporadic; and (2) visitation appeared to be detrimental to Timothy, causing him to "act out," and to have nightmares before and after visitation.
ACCS further alleged that Timothy cannot be placed with either of his parents within a reasonable time and that he should not be placed with either parent. ACCS noted that appellant:
 "continues to have mental health issues which prevent her from providing a safe, stable home for Timothy Bowers. These problems exist in spite of intense treatment involving medication, counseling, support groups, repeated respite, and hospitalizations over the past two years."
ACCS asserted that Timothy's best interests would be served by granting ACCS permanent custody.
On December 15, 1998, January 6, 1999, and February 2, 1999, the trial court held a hearing regarding ACCS's motion for permanent custody. Much of the evidence concerned appellant's mental health status and the effect her mental health problems have on her relationship with her son. Evidence was submitted that: (1) appellant's mental problems cause her to hear voices and to lose periods of time; (2) appellant has hallucinations, nightmares, and flashbacks of abuse; (3) during blackouts, appellant sometimes causes harm to herself; and (4) with the exception of a six-month period in 1989, appellant has been in counseling on a continuous basis from 1988 to the present.
ACCS caseworker aide Georgianna Pennington, who has known appellant for approximately twelve years, testified that she sometimes provided transportation for appellant and conducted home visits. She explained that appellant's relationship with her son was not a typical mother-son relationship. Pennington stated that Timothy frequently acted like the parent, while appellant often acted like the child. She testified that appellant had difficulty controlling her son and that appellant sometimes said things to Timothy that hurt him mentally. She expressed that sometimes she believes appellant is able to care for Timothy, but sometimes she believes that appellant is unable to care for Timothy.
Pennington further testified concerning appellant's mental status. She stated that in July of 1996, appellant told her that she had 86 different personalities or voices, that the voices told her to take her clothes off, and that she smelled men's cologne when it really was not present.
ACCS Family Services caseworker Emma Lee Hughes testified that she has known appellant for approximately twelve years and has known Timothy for most of his nine years. Hughes stated that while appellant took parenting classes, Hughes did not see appellant practice the skills that she was learning. Hughes stated that appellant is unable to practice good parenting skills in a consistent manner and that she does not believe that Timothy would be safe in appellant's home. Hughes further testified that appellant is unable to properly parent when she has mentally unstable episodes.
Hughes also testified that appellant has continued to involve other people in her visitation with her son, although ACCS specifically instructed her to avoid contact with other people during her visitations. Hughes stated that appellant often does not use all of her allotted visitation time due to her inability to properly parent Timothy. For example, Hughes stated that when Timothy is ill or has nightmares, he often calls his foster parent to come pick him up because his mother does not know what to do for Timothy.
Hughes explained that appellant's mental problems often cause her to inflict harm on herself or to lose track of time. Hughes stated that on November 13, 1997, appellant stabbed herself with a knife when hallucinating that her father was beside her. On another occasion, appellant discovered that she was burned, but she did not know how or when she received the burn. Appellant told Hughes that appellant frequently has suicidal ideations and that she hears voices. Appellant also told Hughes that appellant sometimes loses track of days at a time. Hughes stated that appellant told her that appellant hallucinated seeing men in her walls and that she saw dead people on her couch.
Hughes testified that appellant's mental health problems render her home unsafe for Timothy. Hughes stated that Timothy has a right to a stable and safe home. Moreover, Hughes believed that appellant's contact with her son led Timothy to fear for his mother's well-being, because appellant discussed her mental illness with her son.
Bernard Spaulding, Timothy's foster father, testified that Timothy often cares for his mother and that his mother does not always provide appropriate care for her son. Spaulding stated that between October and December of 1998, appellant called him twice in the middle of the night to inquire as to how to care for Timothy when he was ill and as to what to do when Timothy had nightmares. Spaulding testified that appellant does not always use all of her visitation time and that he never knows when appellant is going to pick up Timothy or drop him off. Spaulding also stated that appellant gave her son inappropriate gifts for Valentines Day: adult cologne and deodorant.
Spaulding stated that when Timothy first entered his care: (1) Timothy reacted poorly when he returned from visiting his mother; (2) Timothy's behavior was unpredictable and abnormal; (3) he carved his name into dressers; and (4) he was struggling in school. Spaulding testified that Timothy now is near the top of his class in school, that he is well-mannered, and that he likes his foster father. Spaulding stated that he loves Timothy like a son and that he would like to adopt him if that was Timothy's wish.
Licensed Professional Clinical Counselor Debbie Skidmore, Timothy's counselor, testified that Timothy had been taking Mellaril because he complained of hearing voices. She stated that Timothy no longer hears voices and that Mellaril has been discontinued. Skidmore testified that when he was five, Timothy took Zoloft and Prozac for depression. Skidmore stated that a five year old could become depressed if he does not feel loved. Skidmore stated that Timothy no longer is on medication.
Skidmore explained that Timothy's behavior is much better in foster care due to the structured environment. Skidmore stated that she did not believe it is safe for Timothy to be placed in his mother's home. She noted that during a joint counseling session, his mother yelled at him and he became upset and curled up into a fetal position. She also stated that while in his mother's custody, Timothy saw his aunt and uncle having sexual intercourse.
TCMHC Counselor Sharon Sheets testified that she works in the adult community support program. She stated that the adult community support program counsels adults who have a severe mental disability. Sheets stated that she has been appellant's counselor for approximately the past two years. Sheets explained that although appellant's illness may not be curable, it is treatable. She stated that appellant's length of recovery cannot be predicted, but that she anticipates the intensive portion of therapy to last five years.
Sheets testified that appellant presently has 103 distinct personalities or personality fragments and that the counseling goal is to reintegrate all 103 personalities. Sheets also testified that appellant works extremely hard at trying to get better and that it takes much of her energy to focus on her therapy. Sheets testified that she believes appellant has greatly improved over past year.
TCMHC Case Manager Charlene Sinkowski testified that she works with schizophrenic and severely disabled people and that she has been appellant's caseworker for approximately four and one-half years. She stated that appellant's goal is to live independently in the least restrictive environment. Sinkowski testified that when she first began seeing appellant, appellant frequently lost track of time. On one occasion, appellant "found" herself in Parkersburg, West Virginia. She stated that two and one-half years ago, appellant's mood was erratic, she frequently was suicidal, and she reported having hallucinations and hearing voices. Sinkowski stated that appellant told her that the voices told her to drink Drano and that the voices can be demeaning. Appellant told Sinkowski that she thought she saw dead people on her couch and thought she saw men in her walls.
Sinkowski testified that in the past two years, appellant's coping skills have increased and that her need for hospitalization and respite has decreased. She stated that she has seen appellant make "a lot of progress in the last four an[d] a half years," with the most progress occurring in the past year. Sinkowski stated that: (1) when she was first assigned to the case, she went to appellant's house three or four times per week; (2) that about two years ago, she began going weekly; (3) that several months ago she began going bi-weekly; and (4) that the contacts lasted on average one to one and one-half hours per visit.
Sinkowski stated that appellant has told her that she loves Timothy and that she would like to be a good parent to Timothy. Sinkowski testified that she believes that appellant is able to parent her son. Sinkowski also testified, however, that it would be difficult for a child to watch his mother experience a mental crisis and that the child would suffer some degree of emotional harm if the child witnessed such an event.
Appellant testified that she has been diagnosed with an incurable, though treatable, disease. She stated that when she hears the voices, it is like being in a gymnasium and she cannot concentrate. She stated that she "blacks out" and that when she emerges from the black out, she could be in another room. She testified that she has to live with her mental illness "day in and day out." Appellant stated that certain events can trigger her problems. For instance, she stated that the tone of a person's voice or the way a person touches her may trigger her symptoms.
Appellant testified that in March of 1998, she hallucinated her father was standing in the roadway and that she swerved her car to avoid him, causing a car accident. Appellant stated that in April of 1998, she had feelings that she was being raped, but she had not been raped or otherwise molested. She stated that during April of 1998: (1) she could only sleep for a few hours at night; (2) she often woke up frightened and shaking; and (3) the voices in her head were quite loud and intrusive. Appellant stated that in April of 1998, she had suicidal thoughts at and after her mother's birthday party.
Appellant testified that in May of 1998: (1) her sister sent her pictures of her father and a letter from her father and that receiving the pictures and the letter caused her to have suicidal thoughts; (2) she purchased gasoline and intended to set herself on fire, but she was prevented from doing so when one of her neighbors intervened by taking the gasoline away from appellant; and (3) she had a physical fight with her sisters and this again brought on suicidal thoughts.
In June of 1998, appellant stated that she burned herself during a blackout and that she was afraid to go out of her house because she was afraid of everybody and everything. In August of 1998, appellant stated that she had flashbacks of abuse, lost time, and had blackouts.
Appellant testified that throughout September of 1998, she experienced flashbacks, felt like someone was physically attacking her, and had trouble sleeping. Appellant stated that in September of 1998, while shopping with her mother, she had a panic attack and went into a display rack in the store. She stated that her mother had to throw a coat over her head to take her out of the store.
Appellant testified that during October of 1998, she lost time. On one occasion, she was driving to Cambridge and "found" that she was in Cincinnati. She also stated that while at a Ponderosa restaurant, she had a panic attack and vomited when she saw people coming toward her, although the people existed only in her mind.
Appellant stated that on December 3-4, 1998, she had a panic attack so severe that she found it impossible to leave her home. Appellant testified that she thought she was going to die because she was in severe pain and was hearing voices. Appellant stated that the voices told her that she was going to die, and that they told her to kill herself by taking a bunch of pills and going to sleep.
Appellant testified that "her plate's full right now," and that her weekly schedule is as follows: Monday — therapy and meet with her psychiatrist; Tuesday — Alcoholics anonymous; Wednesday — meet with Charlene Sinkowski, bingo, and Double Trouble; Thursday — therapy and meet with her psychiatrist, Narcotics Anonymous and bingo; Friday — Double Trouble and SAMI.
On December 16, 1998, the guardian ad litem filed a report. The guardian noted that over the two years that she had been Timothy's guardian, she had seen little change in appellant's mental health. The guardian recommended that ACCS be granted permanent custody:
 "Tim needs a stable, supportive, permanent home to continue to function and gain maturity. There is no suitable home in his family of origin. This Guardian ad Litem respectfully recommends that Athens Co. Children Services be granted Permanent Custody of Tim Bowers and adoption by Mr. Spaulding. Tim has found support and love in this large, extended family."
After considering all of the evidence, the trial court found: (1) while Timothy is bonded to his mother, he is strongly bonded to his foster parent; (2) the parent-child relationship is characterized by a high degree of anxiety and fear on Timothy's part; (3) Timothy fears for appellant's life due to her inappropriate comments to him concerning her health; (4) Timothy needs a secure placement that only can be achieved with permanent custody; (5) a reasonable probability exists that Timothy will be adopted; (6) an adoptive placement would positively benefit Timothy; and (7) a grant to ACCS would facilitate adoption in that it would remove natural parents from his life.
The trial court further found: (1) that Timothy does not feel safe with his mother and that Timothy calls his foster father to request that he pick him up from visitations; (2) that Timothy has his mother call the caseworker or the foster father when Timothy is ill or has nightmares because appellant is unable to appropriately parent her son; and (3) that appellant's personality has continued to fragment during counseling.
The trial court found that under the case plan, appellant was to: (1) improve her parenting skills because she did not have age appropriate expectations of Timothy and because she could not control his aggressive behavior; (2) have visitation with her son and limit others involvement in the visitation, as she was having difficulty with her family members; and (3) remain in counseling for her mental illness.
The trial court concluded:
 "[Appellant's] chronic, severe and intrusive mental illness led to Timothy Bowers' removal from her care. Even though provided with substantial treatment for nearly a decade for her problems, [appellant] has been unable to successfully remedy the problem that initially caused Timothy to be placed outside the home as her mental illness still controls her life.
 All of the incidents that have happened since the beginning of 1998, when [appellant] allegedly had improved so much, show that her illness is so severe that it is not only inappropriate for Timothy to return home, but it is also unsafe for him to do so. [Appellant's] frequent losses of time, blackouts, panic attacks and hallucinations of her father, which twice have been dangerous to her, present too great a risk to Timothy's safety and well-being. Ample evidence was presented to show that [appellant's] chronic mental illness makes her unable to provide an adequate permanent home for Timothy both at present and, as anticipated, within one year after the hearing.
 [Appellant] regularly terminated her visits early with her son and did not exercise all of her visitation privileges when able to visit. This disregard of her child's emotional well[-]being shows that she is unwilling or unable to provide an adequate permanent home for Timothy Bowers and demonstrates, by clear and convincing evidence, her lack of commitment toward Timothy Bowers.
 There is no evidence that [appellant] provided Timothy Bowers with his basic necessities during the time that he was in her custody, which demonstrates her unwillingness or inability to provide an adequate permanent home for Timothy Bowers and shows, by clear and convincing evidence, her lack of commitment toward Timothy Bowers.
 * * * [Appellant] has failed to provide the most basic necessity of a child, that of a caring, nurturing, stable, loving environment. She has failed in this area by not fully utilizing her visitation time when she was able to do so."
With respect to Timothy's best interests, the trial court concluded as follows:
 "Timothy Bowers is strongly and positively bonded to Bernard Spaulding, his foster father. The parent-child bond is characterized by a high degree of anxiety and fear on the part of Timothy Bowers. Timothy Bowers fears for [appellant's] safety and well [-]being. Timothy Bowers has bonded to his foster care giver and feels secure and protected when with him.
 Timothy Bowers has not stated where he would like to have his permanent home.
 As the foster father has expressed a desire to adopt Timothy Bowers, if he became available for adoption, there is a reasonable probability that Timothy Bowers will be adopted. An adoptive placement would positively benefit Timothy Bowers."
With respect to reunification, the trial court concluded as follows:
 "* * * [C]lear and convincing evidence demonstrates that such efforts would be futile. Harvey Bunn denied even that he was Timothy Bowers' father and has expressed that he did not want to have anything to do with Timothy Bowers, so any attempt at reunification with him would be futile. [Appellant's] chronic, severe mental illness makes it impossible for her appropriately to parent Timothy Bowers and as such, any further attempt at reunification with her would be futile."
The trial court also concluded that ACCS made reasonable efforts to prevent Timothy's removal from appellant's home. The trial court found that ACCS provided parenting classes, joint and individual counseling, transportation, visitation supervision and case management services.
Thus, the trial court concluded that Timothy's best interests would be served by terminating the natural parent's parental rights and by granting permanent custody to ACCS. Appellant filed a timely notice of appeal.
Appellant's four assignments of error assert, for various reasons, that the trial court erred by granting ACCS permanent custody. Because we find the assignments of error to be interrelated, we will address them together.
In her first assignment of error, appellant asserts that the trial court erred by granting ACCS permanent custody without determining that appellant's conduct has had a direct adverse impact on her child.[3] In her second assignment of error, appellant argues that the trial court erred by determining that clear and convincing evidence exists that Timothy cannot be placed with appellant within a reasonable time. In her third assignment of error, appellant contends that the trial court erred by concluding that clear and convincing evidence exists to illustrate that Timothy's best interests would be served by granting ACCS's motion for permanent custody. In her fourth assignment of error, appellant argues that the court erred by granting ACCS's motion for permanent custody without adequately specifying the "reasonable efforts" ACCS made to prevent Timothy's removal from his natural mother. ACCS asserts that substantial competent and credible evidence exists to support the trial court's decision to award ACCS permanent custody.
While we recognize that a parent has a "fundamental liberty interest" in the care, custody, and management of his or her child and an "essential" and "basic civil right" right to raise his or her children, In re Murray (1990), 52 Ohio St.3d 155,156, 556 N.E.2d 1169, 1171, we note that the rights and interests of the parent are not absolute.
R.C. 2151.413[4] permits a public children services agency to file a motion requesting permanent custody of a child. The statute provides:
 (A) A public children services agency * * * that * * * is granted temporary custody of a child * * * may file a motion * * * requesting permanent custody of the child * * *.
In considering a motion filed pursuant to R.C. 2151.413, the trial court must follow the guidelines set forth in R.C. 2151.414.
R.C. 2151.414 (A) (1) requires the trial court to hold a hearing regarding the motion for permanent custody. The purpose of the hearing is to allow the trial court to determine whether the child's best interests would be served by permanently terminating the parental relationship and by awarding permanent custody to the agency. See R.C. 2151.414 (A) (1). The adjudication that the child is an abused, neglected, or dependent child may not be readjudicated at the hearing. See id.
R.C. 2151.414 (B) (1) requires a trial court, before granting permanent custody, to determine whether the child's best interest would be served by the award of permanent custody and whether the child "cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents." We note that both the "best interest" determination and the "cannot be placed with either parent" determination focus on the child, not the parent. R.C. 2151.414 (C) prohibits the trial court from considering the effect the granting of permanent custody to the children services agency would have upon the parents.
R.C. 2151.414 (D) requires the trial court to consider specific factors in determining whether the child's best interests would be served by granting the motion for permanent custody:
 (D) In determining the best interest of a child * * * the court shall consider all relevant factors, including, but not limited to, the following:
 (1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child;
 (2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
(3) The custodial history of the child;
 (4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency.
R.C. 2151.414 (E) sets forth the factors a trial court must consider in determining whether the child cannot be placed with either parent within a reasonable time:
 (E) In determining at a hearing * * * whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, * * * that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:
 (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
 (2) Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing * * *;
 (3) The parent committed any abuse as described in section 2151.031 [2151.03.1] of the Revised Code against the child, caused the child to suffer any neglect as described in section 2151.03 of the Revised Code, or allowed the child to suffer any neglect as described in section 2151.03 of the Revised Code between the date that the original complaint alleging abuse or neglect was filed and the date of the filing of the motion for permanent custody;
 (4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;
 (5) The parent is incarcerated for an offense committed against the child or a sibling of the child;
 (6) The parent [committed a certain criminal offense];
 (7) The parent is incarcerated at the time of the filing of the motion for permanent custody or the dispositional hearing of the child and will not be available to care for the child for at least eighteen months after the filing of the motion for permanent custody or the dispositional hearing;
 (8) The parent is repeatedly incarcerated and the repeated incarceration prevents the parent from providing care for the child;
 (9) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect;
 (10) The parent has committed abuse as described in section 2151.031 of the Revised Code against the child or caused or allowed the child to suffer neglect as described in section 2151.03 of the Revised Code and the court determines that the seriousness, nature, or likelihood of recurrence of the abuse or neglect makes the child's placement with the child's parent a threat to the child's safety;
 (11) The parent committed abuse as described in section 2151.031 of the Revised Code against the child or caused or allowed the child to suffer neglect as described in section 2151.03 of the Revised Code and a sibling of the child previously has been permanently removed from the home of the child's parents because the parent abused or neglected the sibling.
(12) Any other factor the court considers relevant.
A trial court may base its decision that a child cannot be placed with either parent within a reasonable time upon the existence of any one of the above factors. The existence of one factor alone will support a finding that the child cannot be placed with either parent within a reasonable time. See In reHurlow (Sept. 21, 1998), Gallia App. No. 98 CA 6, unreported; Inre Butcher (Apr. 10, 1991), Athens App. No. 1470, unreported.
In considering a motion for permanent custody, a trial court should also consider the underlying principles of R.C. Chapter 2151:
 (A) To provide for the care, protection, and mental and physical development of children * * *;
* * * *
 (C) To achieve the foregoing purpose , whenever possible, in a family environment, separating the child from its parents only when necessary for his welfare or in the interests of public safety.
R.C. 2151.01.
Clear and convincing evidence must exist to support an award of permanent custody. The Supreme Court of Ohio has defined "clear and convincing evidence" as follows:
 "[T]he measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal."
In re Estate of Haynes (1986), 25 Ohio St.3d 101, 103-04,495 N.E.2d 23, 26; see, also, State v. Schiebel (1990), 55 Ohio St.3d 71,74, 564 N.E.2d 54, 60. In reviewing whether the lower court's decision was based upon clear and convincing evidence, "a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." Schiebel, 55 Ohio St.3d at 74,564 N.E.2d at 60. If the lower court's judgment is "supported by some competent, credible evidence going to all the essential elements of the case," a reviewing court may not reverse that judgment. Id.
Moreover, "an appellate court should not substitute its judgment for that of the trial court when there exists competent and credible evidence supporting the findings of fact and conclusion of law." Id.. Issues relating to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact. As the court explained in Seasons CoalCo. v. Cleveland (1984), 10 Ohio St.3d 77, 80, 461 N.E.2d 1273,1276:
 "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony."
In the case at bar, we find ample competent, credible evidence to support the trial court's decision to award ACCS permanent custody of Timothy. Substantial competent and credible evidence exists that Timothy's best interest will be served by granting ACCS permanent custody and that Timothy cannot be placed with either parent within a reasonable time.
At the hearing, testimony was presented that Timothy's best interests would be served by awarding ACCS permanent custody. ACCS Resource Unit Supervisor and Certified Adoption Assessor Linda Well testified that Timothy would be easily adopted. Timothy's foster parent testified that he would like to adopt Timothy, if that was Timothy's wish. Well also noted that children who are placed in long-term foster care, as opposed to permanent custody, lack stability. Well testified that children who remain in ACCS's custody in a long-term foster care arrangement typically change placement. Well also stated that ACCS's Executive Director normally makes all life-impacting decisions with respect to long-term foster care children, including religious upbringing. Moreover, Well stated that long-term foster care children have all support terminated when they reach the age of majority.
Licensed Professional Clinical Counselor Debbie Skidmore, Timothy's counselor, testified that Timothy's behavior appeared much better while he was in foster care, due to the structured environment. Skidmore informed the trial court that she did not believe that it was safe for Timothy to be returned to his mother.
Bernard Spaulding, Timothy's foster father, testified that Timothy often cares for his mother and that his mother does not always provide appropriate care for Timothy. Spaulding stated that when Timothy visits with his mother, Timothy often calls Spaulding to ask Spaulding to pick Timothy up from his mother's home. Spaulding stated that appellant is unable to properly supervise Timothy.
The trial court found that although Timothy has a bond with his mother, he also has a strong bond with his foster father. The trial court noted that Timothy's relationship with his mother is characterized by a high degree of anxiety and fear on Timothy's part.
Thus, we find substantial competent and credible evidence to support the trial court's conclusion that Timothy's best interests would be served by granting ACCS permanent custody of Timothy.
We also find substantial competent and credible evidence to support the trial court's decision that Timothy cannot be placed with either parent within a reasonable time. First, we note that Timothy's natural father: (1) expressed his desire to abandon the child; (2) denounced that he is Timothy's father; (3) took no active part in the proceedings; and (4) expressed no desire to involve himself in Timothy's life. Under the foregoing circumstances, we find no error with the trial court's decision that Timothy cannot be placed with his father within a reasonable time.
We also believe that substantial competent and credible evidence exists to demonstrate that Timothy cannot be placed with his mother within a reasonable period of time. Several witnesses testified that appellant suffers from a chronic mental illness and that the length of her recovery cannot be predicted. Moreover, although we note that appellant claims that she will eventually recover, appellant is unable to predict when her recovery will occur. Her recovery could be in six months or six years. Substantial evidence exists that it is not safe to return Timothy to his mother's home either at the present time or within the upcoming year. Appellant testified that during 1998, she had several panic attacks and had suicidal ideations. Thus, we believe that the existence of appellant's severe mental illness presented the trial court with ample cause to conclude that Timothy cannot be placed with his mother within a reasonable period of time. See R.C. 2151.414 (E) (2); Hurlow, supra; Butcher,supra.
We also find substantial competent and credible evidence that ACCS made reasonable efforts to avoid removing Timothy from the home. R.C. 2151.419 (A) requires the court to determine whether the agency "has made reasonable efforts to prevent the removal of the child from his home, to eliminate the continued removal of the child from his home, or to make it possible for the child to return home." In addition, R.C. 2151.419 (B) requires the trial court to issue written finding of facts setting forth its determination under division (A) of this section. The court must briefly describe the relevant services provided by the agency to the family of the child and why those services did not prevent the removal of the child from his home or enable the child to return home. A trial court may conclude that reasonable efforts are not necessary when such efforts would be futile. See, e.g., In re Lawson (Apr. 18, 1997), Clark App. No. 96 CA 10, unreported.
In the case at bar, ample evidence was presented that ACCS provided appellant with parenting classes. The trial court found that appellant was unable to apply the skills she learned in parenting classes. Moreover, ample evidence was presented that both appellant and Timothy received counseling. Additionally, ACCS permitted adequate visitation between appellant and her son, but appellant was unable to avail herself of full visitation.
We recognize that much of appellant's argument centers around the conflict in testimony as to appellant's present mental health status. Appellant notes that she presented testimony that she has improved and can properly care for her son. We emphasize, however, that our role as a reviewing court is not to re-weigh the evidence and to assess the credibility of witnesses. Rather, as stated in State v. Awan (1986), 22 Ohio St.3d 120,123, 489 N.E.2d 277, 280, appellate courts must defer conflicts in the evidence to the trier of fact who had the opportunity to hear witnesses and observe their demeanor:
 "The choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its judgment for that of the trier of fact."
While we sympathize with appellant's plight, and understand that she suffered severe abuse at the hands of her father, we cannot overlook the impact that her illness has on the best interests of her child. As the court recognized in In re Bishop
(1987), 36 Ohio App.3d 123, 126, 521 N.E.2d 838, 841-42:
 "`* * * [A] child should not have to endure the inevitable to its great detriment and harm in order to give the * * * [parent] an opportunity to prove her suitability. To anticipate the future, however, is at most, a difficult basis for a judicial determination. The child's present condition and environment is the subject for decision not the expected or anticipated behavior of unsuitability or unfitness of the * * * [parent]. * * * The law does not require the court to experiment with the child's welfare to see if he will suffer great detriment or harm.'"
(quoting In re East (1972), 32 Ohio Misc. 65, 69, 288 N.E.2d 343,346).
Accordingly, based upon the foregoing reasons, we overrule appellant's four assignments of error and affirm the trial court's judgment.
JUDGMENT AFFIRMED.
 JUDGMENT ENTRY
It is ordered that the judgment be affirmed and that appellee recover of appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Athens County Common Pleas Court, Juvenile Division, to carry this judgment into execution.
A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
HARSHA, J. EVANS, J.: Concur in Judgment Opinion
For the Court
 BY: ________________________ PETER B. ABELE, Judge
 NOTICE TO COUNSEL
Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.
[1] On January 8, 1997, the court dismissed the neglect complaint.
[2] R.C. 2151.353 (E) (2) provides:
 Any public children services agency * * * may at any time request the court to modify or terminate any order of disposition issued pursuant to division (A) of this section * * *.
[3] ACCS asserts that appellant's first assignment of error improperly attempts to readjudicate the dependency finding. We agree with ACCS that whether the trial court properly found Timothy to be a dependent child is not a proper issue before this court. We believe, however, that appellant's first assignment of error can be construed as an argument relating to whether the trial court erred by determining that Timothy cannot be placed with appellant within a reasonable time — the same issue appellant raises under her second assignment of error. Thus, we address appellant's first assignment of error along with her second assignment of error.
[4] We note that the R.C. Chapter 2151 provisions cited within this opinion were amended effective March 18, 1999. Because the permanent custody hearing took place before the March 18, 1999 effective date, our references are to the former versions of the applicable statutes.